FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2010 AUG 23  P 3: 20

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| CRAIG SANFORD ) | |
| MARY JO SANFORD, ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:10C V940 |
| ) | GBL/IDD |
| SCG INTERNATIONAL, LLC, ) | |
| SERVE:     James F. Smith, Jr. ) | |
|                   222 Central Park Avenue ) | |
|                   Suite 1170 ) | |
|                   Virginia Beach, VA  23462 ) | |
| ) | |
|                   and ) | |
| ) | |
| JAMES F.SMITH, JR. a.ka. "Jamie" Smith ) | |
| SERVE:     3956 Dawley Road ) | |
|                   Virginia Beach, VA  24457 ) | |
| ) | |
|                   Defendants. ) | |

**COMPLAINT**

The Plaintiffs Craig Sanford and Mary Jo Sanford, by counsel, hereby state the following

in support of their Complaint against the defendants James Frank Smith a/k/a "Jamie Smith"

("Defendant Smith") and SCG International, LLC ("Defendant SCG"):

Parties

1.     The Plaintiffs are residents of the State of Pennsylvania.

2.     The Defendant Smith is a resident of the Commonwealth of Virginia. The

Defendant SCG is also a Virginia limited liability company with its principal place of business in

the Commonwealth.  Defendant Smith represents himself as the "Chief Executive Officer."

3.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332, because the plaintiffs do not share citizenship in the same state as any defendant and the amount in controversy is over $75,000.00.

4.     This matter arises from a transaction which occurred in 2007. At that time, the Sanfords had just sold a medical waste business which netted them a considerable amount of money. They were looking for a vehicle in which to invest their money.

5.     Mr. Sanford met Defendant Smith in the fall of 2007. Defendant Smith introduced himself as a successful entrepreneur in the security business who was a graduate of Harvard Law School. He described himself as a former CIA operative who spent significant time in the Middle East during the Iraq War as a Director with "Blackwater USA," which training he later used to build his own personal security and national security company. He also indicated that his company (SCG) held over $50 million in government contracts and had numerous diplomatic ties overseas. As the Sanfords later learned, all of these statements are false, except for the fact that Defendant Smith owns SCG.

6.     During their conversations, Defendant Smith related to Mr. Sanford that his company, Defendant SCG, had a unique ability to invest funds overseas and bring a guaranteed annual return of 10% on the principal. Defendant Smith stated that he and his company could temporarily invest the Sanfords' funds in an "ongoing commercial enterprise" (or "investment account") safely protected from any taxes, liens or creditors.

7.     On several occasions, Defendant Smith offered to hold the funds for the Sanfords separately and safely with the understanding that the funds would be released in 2009. He continually represented that the funds would be protected in a tax-free segregated account. The

2

Sanfords received and relied upon these representations.

8.   On November 14, 2007, the Sanfords agreed to the transaction presented by
Defendant Smith and Defendant SCG. In reliance upon the foregoing representations of
Defendant Smith and Defendant SCG, they sent two checks via overnight mail on November 21,
2007 directly to Defendant Smith at his personal residence.

9.   Shortly thereafter, the Sanfords received a "Promissory Note" from SCG which
referenced their "investment" and their agreement to "disburse $12,500,000.00." The
"Promissory Note" failed to reflect the promised interest rate of 10%. Instead it awarded
minimal interest (0.9%) to the Sanfords. It did state that the funds would be returned with
interest in eighteen months (May 27, 2009). See a copy of the "Promissory Note" attached as
Exhibit A.

10.   For the next several months, the Sanfords received updates on their "investment"
with Defendant SCG. For example, they received emails from SCG officers which told them that
their "money is invested in numerous place, foreign and domestic." See March 18th, 2008 email
attached as Exhibit B.

11.   In reliance upon these statements, the Sanfords did not move forward to seek the
return of their monies in 2008 but rather trusted Defendant Smith and Defendant SCG to manage
the assets for them.

12.   On April 9th, 2009, Mr. Sanford was driving in his car when he was called by the
attorney for Defendant SCG. At that time, Mr. Sanford had been pressing SCG to release his
funds which were due back to him within six weeks.

13.   On that phone call, the attorney for Defendant SCG that the Sanfords' money

3

had "been lost in the stock market." No more details were given.

14.   From that date forward, the Sanfords have had no response from Defendant Smith or Defendant SCG despite repeated inquiries. They have never been given any receipts showing securities or properties bought on their behalf. Nor have they received any records of bank deposits or transfers.

15.   In the fall of 2009, the Sanfords undertook an investigation into the finances of Defendant SCG and Defendant Smith. During that time, they discovered concealed facts about Defendant Smith and Troy Titus, who is serving Federal prison time for investment fraud. Titus was an officer of Defendant SCG where he worked directly for Smith.

16.   According to grand jury transcripts obtained by the Sanfords, Titus acknowledged Defendant Smith's obtaining of $12.5 million in 2007 from the Sanfords as a "gift from God" which could be used for the personal purposes of Smith and SCG.

17.   Upon information and belief, Defendant Smith and Defendant SCG never intended to set up an "investment account" for the Sanfords. Nor did they invest the Sanfords' money in an "ongoing commercial enterprise."

18.   Upon information and belief, the Sanfords' money was utilized for purchasing properties and investment opportunities for Defendant Smith personally, including several properties under a "lease-purchase" arrangement which effectively conceals the ownership interest of Defendant Smith and/or SCG. Indeed, there is no evidence that Defendant Smith and Defendant SCG ever set up an investment account of any type for the Sanfords.

19.   Upon information and belief, the Sanfords' funds were actually diverted into a series of real estate investments in Virginia, North Carolina and Hawaii, made through various

4

straw purchasers on behalf of Defendant Smith and Defendant SCG.

20.     Upon information and belief, Defendant Smith and Defendant SCG have converted the funds of the Sanfords for their own purposes by commingling them with other investment funds.

21.     Upon information and belief, Defendant Smith and Defendant SCG have operated a sham investment scheme with the intention of defrauding the Sanfords out of an extraordinary sum of money.

22.     Upon information and belief, Defendant Smith and Defendant SCG never intended to (and never did) set up a separate account for the Sanfords or "invest in an ongoing commercial enterprise." Instead, their sole purpose in soliciting the $12,500,000.00 was to convert the funds for their own purposes.

23.     The actions taken by Defendant Smith and Defendant SCG have been taken willfully, wantonly and with conscious disregard for the rights of the Sanfords.


### COUNT ONE -- FRAUD

24.     The Sanfords hereby incorporate the allegations contained in paragraphs 1-23 above:

25.     At all relevant times, Defendants Smith and SCG made material misrepresentations of presently existing facts to the Sanfords, with the knowledge that the representations were false and with the intent that they be relied upon. In the alternative, they made these false statements negligently but with the intent that they be relied upon.

26.     The Sanfords relied upon these misrepresentations to their detriment.

27.     As a direct and proximate result of Defendants' misrepresentations, the Sanfords

5

incurred damages in the amount of twelve million five hundred thousand ($12,500,000.00) dollars.

## COUNT TWO -- CONVERSION

28.     The Sanfords hereby incorporate the allegations contained in paragraphs 1-23 above.

29.     The Sanfords tendered funds to Defendant SCG and Defendant Smith for purposes of investing on their behalf. Those funds have since been converted to the benefit of Defendant SCG and Defendant Smith without the consent of the Sanfords.

30.     As a direct and proximate result of Defendants' conversion, the Sanfords have been damaged in the amount of twelve million five hundred thousand ($12,500,000.00) dollars.

## COUNT THREE – UNJUST ENRICHMENT
## AND CONSTRUCTIVE TRUST

31.     The Sanfords hereby incorporates the allegations in paragraphs 1 - 23 above.

32.     Defendant SCG and Defendant Smith received $12,500,000.00 from the Sanfords for the purpose of investing on their behalf. These funds were obtained by fraudulent means.

33.     Upon information and belief, Defendant Smith and Defendant SCG have utilized (and continue to utilize) these funds on their own behalf or through businesses or properties which they have obtained with the Sanfords' money.

34.     It is unjust and inequitable for the Defendants to retain this benefit.

WHEREFORE, the foregoing premises considered, Craig Sanford and Mary Jo Sanford seek judgment against all the Defendants, jointly and severally, in the following amounts:

6

- o $12,500,000.00 in compensatory damages;

- o $350,000 in punitive damages;

- o Pre-judgment interest from November 21, 2007 and costs;

- o A constructive trust on any business or property purchased with their funds;

- o Such other relief as the Court may deem equitable.

CRAIG SANFORD
MARY JO SANFORD

By:_____
                    Counsel

J. Chapman Petersen, Esq., VSB #37225
John C. Bazaz, Esq., VSB #70796
Kristin Cahoon, Esq., VSB#72791
SUROVELL MARKLE ISAACS & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone 703.251.5400
Facsimile 703.591.9285
jpetersen@smillaw.com