IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CRAIG SANFORD )<br>MARY JO SANFORD, )<br>                    Plaintiffs, )<br>)<br>v. )<br>)<br>SCG INTERNATIONAL, LLC, )<br>)<br>JAMES F.SMITH, JR. a.ka. "Jamie" Smith )<br>)<br>    3956 Dawley Road )<br>    Virginia Beach, VA 24457 )<br>)<br>                    Defendants. )<br>) | Civil Action No. 1:10cv940 GBL/IDD |

**AMENDED COMPLAINT**

The Plaintiffs Craig Sanford and Mary Jo Sanford, by counsel, hereby state the following in support of their Complaint against the defendants James Frank Smith a/k/a "Jamie Smith" ("Jamie Smith") and SCG International, LLC ("SCG"):

Parties

1. The Plaintiffs are residents of the State of Pennsylvania.

2. Jamie Smith is a resident of the Commonwealth of Virginia. SCG is also a Mississippi limited liability company with its principal place of business in the Commonwealth. Upon information and belief, Jamie Smith is the "Chief Executive Officer" of SCG and owns 100% of the company.

3. Jurisdiction is proper in this Court under 28 U.S.C. § 1332, because the plaintiffs do not share citizenship in the same state as any defendant and the amount in controversy is over

$75,000.00.

4. This matter arises from a transaction which first began in 2007. At that time, the Sanfords had just sold a medical waste business which netted them a considerable amount of money. Subsequent to that sale, they had been involved in litigation which sought to hold them personally liable for a substantial sum. Therefore, the Sanfords were looking in fall 2007 for a vehicle in which to safely invest their money free from creditors.

5. Mr. Sanford met Jamie Smith and Allison Smith, Jamie Smith's wife, in the fall of 2007. Jamie Smith introduced himself as a successful entrepreneur in the security business who was a graduate of Harvard Law School. He described himself as a former CIA operative who spent significant time in the Middle East during the Iraq War as a Director with "Blackwater USA," which training he later used to build his own personal security and national security company. He also indicated that his company (SCG) held over $50 million in government contracts and had numerous diplomatic ties overseas. As the Sanfords later learned, all of these statements are false, except for the fact that Defendant Smith owns SCG.

6. During their conversations, Jamie Smith related to Mr. Sanford that his company, SCG, had a unique ability to invest funds overseas and bring a guaranteed annual return of 10% on the principal. Defendant Smith stated that he and his company could temporarily hold the Sanfords' funds in an "ongoing commercial enterprise" (or "investment account") safely protected from any taxes, liens or creditors.

7. On several occasions, Defendant Smith reiterated his offer to hold the funds for the Sanfords separately and safely with the understanding that the funds would be released back to the Sanfords in 2009. He continually represented that the funds would be protected in a tax-

free account, which would be safe from creditors. The Sanfords received and relied upon these representations.

8. On or about November 14, 2007, the Sanfords agreed to the transaction presented by Jamie Smith and SCG. In reliance upon the foregoing representations of Smith and SCG, they sent two checks via overnight mail on November 21, 2007 directly to Jamie Smith at his personal residence in Virginia Beach, where he lived with Allison Smith.

9. Shortly thereafter, the Sanfords received a "Promissory Note" from SCG which referenced their "investment" and their agreement to "disburse $12,500,000.00" to SCG. The "Promissory Note" failed to reflect the promised interest rate of 10%. Instead it awarded minimal interest (0.9%) to the Sanfords. It did state that the funds would be returned to the Sanfords with interest in eighteen months (May 27, 2009). A true and accurate copy of the "Promissory Note" is attached as Exhibit A.

### Jamie Smith and SCG Create Accounts And Convert Funds

10. Jamie Smith received the Sanford funds and deposited them on November 29, 2007 in SCG's corporate bank account ("the business account") held with First Security Bank ("the Bank") in Batesville, Mississippi. Prior to the infusion of the Sanford money, the SCG accounts held minimal capital.

11. Prior to that deposit, Jamie Smith informed the Bank that he would be receiving a large payment from the Department of Defense which he intended to hold as a long-term maturing asset for SCG and his family. He did not mention the true source of the funds, which was the $12.5 million being entrusted by the Sanfords.

free account, which would be safe from creditors. The Sanfords received and relied upon these representations.

8. On or about November 14, 2007, the Sanfords agreed to the transaction presented by Jamie Smith and SCG. In reliance upon the foregoing representations of Smith and SCG, they sent two checks via overnight mail on November 21, 2007 directly to Jamie Smith at his personal residence in Virginia Beach, where he lived with Allison Smith.

9. Shortly thereafter, the Sanfords received a "Promissory Note" from SCG which referenced their "investment" and their agreement to "disburse $12,500,000.00" to SCG. The "Promissory Note" failed to reflect the promised interest rate of 10%. Instead it awarded minimal interest (0.9%) to the Sanfords. It did state that the funds would be returned to the Sanfords with interest in eighteen months (May 27, 2009). A true and accurate copy of the "Promissory Note" is attached as Exhibit A.

### Jamie Smith and SCG Create Accounts And Convert Funds

10. Jamie Smith received the Sanford funds and deposited them on November 29, 2007 in SCG's corporate bank account ("the business account") held with First Security Bank ("the Bank") in Batesville, Mississippi. Prior to the infusion of the Sanford money, the SCG accounts held minimal capital.

11. Prior to that deposit, Jamie Smith informed the Bank that he would be receiving a large payment from the Department of Defense which he intended to hold as a long-term maturing asset for SCG and his family. He did not mention the true source of the funds, which was the $12.5 million being entrusted by the Sanfords.

12. At the request of Smith, the Bank opened a new "Trust Account" in November 2007, just prior to receipt of the Sanford funds. The purpose of the "Trust Account" was to produce a stream of investment income for SCG and the Smiths personally, according to the Trust documents. The Sanfords are not mentioned anywhere.

13. On November 27, 2007, while he was establishing the "Trust Account" and just prior to depositing the Sanford funds in the "business account," Smith opened a business credit line for SCG with the Bank. He also opened up two charge card accounts for himself and Allison Smith with monthly limits of $20,000 against the "business account." Finally, he instructed the Bank to make SCG's payroll payments from the "business account," as opposed to his previous corporate account in Virginia A true and accurate copy of Jamie Smith's November 27, 2007 directions to the Bank in this regard is attached as Exhibit B.

14. The sole purpose of the Smiths obtaining these charge cards was to enable them to live off the Sanford money, while Jamie Smith also used those funds to subsidize his business.

15. On November 30, 2007, the day after the Sanford checks cleared and having established the above accounts, Jamie Smith transferred $10 million to the "Trust Account." The remaining funds ($2.5 million) were left in SCG's "business account."

16. Jamie Smith did not give any notice to the Sanfords that he was (i) putting $2.5 million of their money in a business account used to support SCG's payroll and his own personal expenses, or (ii) setting aside the remaining $10 million for his own long-term security. They had no knowledge in that regard.

## The Sanford Money is Spent and/or Distributed Without their Knowledge

17. For the next two years (December 2007 through December 2009), Smith subsidized his business and personal life through the $12.5 million entrusted by the Sanfords.

18. During that time, he spent millions of dollars through the "business account" on international trips, four-star hotels and heavy equipment for SCG, including vehicles and "armored carriers." Jamie and Allison also used the credit cards to finance their personal life, including meals, trips, jewelry and other personal gifts.

19. By late 2009, Jamie Smith, SCG and Allison Smith had spent their way through millions of dollars which was directly pulled from the "business account" and "trust account," each of which had been capitalized by the Sanford money.

20. During that time, Jamie Smith, SCG and Allison Smith also distributed funds from the "trust account" and "business account" to other investment accounts to which they solely had access.

21. By the end of 2009, the "business account" and "trust account" had been nearly completely emptied. The Sanford money was effectively gone.

22. At no point did Jamie Smith, SCG or Allison Smith make any repayment to the Sanfords. Nor did they hold their funds in an escrow account. Nor did they use the funds to "buy" a business for the Sanfords. Nor did they account for how the funds were actually being spent. Instead, they spent the money as fast as they could and concealed the remainder through transactions to which the Sanfords had no access.

23. At no point did the Smiths or SCG have an intent to keep the Sanford money in a

separate account or hold it for their alleged "client."

## Sanfords Seek Repayment

24. For the first half of 2008, the Sanfords received updates on their "investment" with SCG. For example, they received emails from SCG officers which told them that their "money is invested in numerous place, foreign and domestic." See March 18th, 2008 email attached as Exhibit C.

25. This statement was false on its face, as the Sanfords money had actually been placed in SCG's own accounts in Mississippi and was being "burned through" at the rate of $300,000-400,000 a month.

26. In reliance upon these statements, the Sanfords did not move forward to seek the return of their monies in 2008 but rather trusted Jamie Smith and SCG to manage the monetary assets for them.

27. On April 9th, 2009, Mr. Sanford was driving in his car when he was called by the attorney for Defendant SCG. At that time, Mr. Sanford had been pressing SCG for details on the release of his funds which were due back to him within six weeks.

28. On that phone call, the attorney for Defendant SCG told Mr. Sanford that the Sanfords' money had "been lost in the stock market." No more details were given.

29. Upon information and belief, that statement was false and was intended to prevent the Sanfords from learning the true information about their $12.5 million.

30. From that date forward, the Sanfords received no response from Defendant Smith or Defendant SCG despite repeated inquiries. They received no receipts showing securities or properties bought on their behalf. Nor did they receive any records of bank deposits or transfers.

## The True Facts Are Learned

31. Since initiating this litigation in September 2010, the Sanfords have served subpoenas on the Bank and uncovered actual documentation regarding the use of their funds. Prior to that, they had no knowledge that Jamie Smith, Allison Smith and SCG were spending their funds rather than holding them in a safe and segregated account.

32. Upon information and belief, Jamie Smith, Allison Smith and SCG have converted the funds of the Sanfords for their own purposes by commingling them with other investment funds.

33. Upon information and belief, Jamie Smith, Allison Smith and SCG have operated a sham investment scheme with the intention of defrauding the Sanfords out of an extraordinary sum of money.

34. Upon information and belief, Jamie Smith, Allison Smith and SCG never intended to (and never did) set up a separate account for the Sanfords or "invest in an ongoing commercial enterprise." Instead, their sole purpose in soliciting the $12,500,000.00 was to convert the funds for their own purposes, so that they could use the money for living expenses and to subsidize their own business.

35. The actions taken by Jamie Smith, Allison Smith and SCG have been taken willfully, wantonly and with conscious disregard for the rights of the Sanfords.

COUNT ONE – FRAUD
(All Defendants)

36. The Sanfords hereby incorporate the allegations contained in paragraphs 1-35 above:

37. At all relevant times, Defendants Smith and SCG made material misrepresentations of

presently existing facts to the Sanfords, with the knowledge that the representations were false and with the intent that they be relied upon. In the alternative, they made these false statements negligently but with the intent that they be relied upon.

38. The Sanfords relied upon these misrepresentations to their detriment.

39. As a direct and proximate result of Defendants' misrepresentations, the Sanfords incurred damages in the amount of twelve million five hundred thousand ($12,500,000.00) dollars.

## COUNT TWO – CONVERSION
(All Defendants)

40. The Sanfords hereby incorporate the allegations contained in paragraphs 1-39 above.

41. The Sanfords tendered funds to SCG and Jamie Smith for purposes of investing on their behalf. Those funds have since been converted by SCG and Jamie Smith to the benefit of all the Defendants without the consent of the Sanfords.

42. As a direct and proximate result of Defendants' conversion, the Sanfords have been damaged in the amount of twelve million five hundred thousand ($12,500,000.00) dollars.

## COUNT THREE – BREACH OF FIDUCIARY DUTY
(All Defendants)

43. The Sanfords hereby incorporate the allegations contained in paragraphs 1-42 above.

44. By offering to hold the Sanfords' funds for them in a protected account, Jamie Smith and SCG established a fiduciary relationship with the Sanfords. They breached this relationship by subsequently converting the property to their own use, without permission.

45. As a direct and proximate result of Defendants' breach of fiduciary duty, the Sanfords have been damaged in the amount of twelve million five hundred thousand ($12,500,000.00) dollars.

## COUNT FOUR – UNJUST ENRICHMENT
## AND CONSTRUCTIVE TRUST
### (All Defendants)

46.     The Sanfords hereby incorporates the allegations in paragraphs 1 - 45 above.

47.     Defendant SCG and Defendant Smith received $12,500,000.00 from the Sanfords for the purpose of investing on their behalf. These funds were obtained by fraudulent means and/or converted to the benefit of all the defendants.

48.     Upon information and belief, Defendants Jamie Smith and SCG have utilized (and continue to utilize) these funds on their own behalf or through businesses or properties which they have obtained with the Sanfords' money.

49.     It is unjust and inequitable for the Defendants to retain this benefit.

## COUNT FIVE – BREACH OF CONTRACT
### (SCG)

50.     The Sanfords hereby incorporate the allegations contained in paragraphs 1-499 above.

51.     The Sanfords entered a legally binding contract with SCG which requires SCG to repay their $12.5 million principal with interest according to the terms expressed therein.

52.     The Sanfords have fulfilled all conditions precedent according to that agreement and are due the funds owed to them. SCG is in breach of the contract.

53.     As a direct and proximate result of SCG's breach, the Sanfords have been damaged in the amount of twelve million five hundred thousand ($12,500,000.00) dollars.

WHEREFORE, the foregoing premises considered, Craig Sanford and Mary Jo Sanford seek judgment against all the Defendants, jointly and severally, in the following amounts:

- $12,500,000.00 in compensatory damages;
- $350,000 in punitive damages;
- Pre-judgment interest from November 21, 2007 and costs;
- A constructive trust on any business or property purchased with their funds;
- Attorneys' fees as permitted by Virginia law;
- Such other relief as the Court may deem equitable.

CRAIG SANFORD
MARY JO SANFORD

By: _____
Counsel

J. Chapman Petersen, Esq., VSB #37225
Jason F. Zellman, Esq., VSB #77499
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone 703.251.5400
Facsimile 703.591.9285
jpetersen@smillaw.com