IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CRAIG SANFORD, et al. ) | |
| ) | |
| Plaintiffs. ) | |
| ) | Civil Action No. 1:10-cv-00940-GBL-IDD |
| v. ) | |
| ) | |
| SCG INTERNATIONAL, LLC, et al. ) | |
| ) | |
| Defendants. ) | |

**THE SANFORDS' OPPOSITION TO THE
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Plaintiffs Craig Sanford and Mary Jo Sanford ("Sanfords"), by counsel, hereby state the following in opposition to the Defendants' Motion for Summary Judgment:

**I.   CASE HISTORY**

This cause arises from the actions and statements of Defendant Jamie Smith ("Defendant Smith"), who is the CEO of co-defendant SCG International, LLC ("SCG"). In essence, this case deals with Defendant Smith receiving $12.5 million in cash from the plaintiffs for ostensibly safekeeping in an "investment account," then absconding with it for his own personal purposes. Defendant Smith now claims that **every single dollar** was "lost in the market," even though the Dow Jones Industrial Average today is higher than it was in November 2007, when the money was first entrusted. That is false. He is a fraud.

**Defendant Smith Perpetrates the Fraud**

In 2007, Defendant Smith traveled to Pennsylvania in order to perform a "training" session for law enforcement in Sanford's hometown of Falls Township. (See Affidavit of Craig Sanford attached to the Defendants' First Motion to Dismiss as Exhibit A). At that time, he met

the Sanfords who were looking for a safe place to invest a substantial sum of money they held from the sale of a family business. Defendant Smith saw an opportunity.

Shortly thereafter, Defendant Smith convinced the Sanfords to entrust $12.5 million to him for safekeeping in a "segregated investment account" with SCG. (Sanford Aff. at ¶ 4). He confirmed this deal with emails he sent to Sanford immediately thereafter. See Exhibit B attached to the Memorandum in Support of the Sanfords' Motion for Summary Judgment, an email attached from "jamie@scgonline.net" dated November 19, 2007 ("Craig: It was good to meet you last week and I'm excited about the investment arrangement that we discussed and agreed to on Wednesday of that week. Jamie").[1]

Based upon that "arrangement" and other false representations of Defendant Smith, the Sanfords tendered two checks aggregating $12.5 million to Smith on November 14, 2007. It is undisputed that Smith personally received the funds at his house in Virginia Beach. Shortly thereafter, he gave the Sanfords a writing which referenced the $12.5 million for "the establishment of investment account" and confirmed that Defendant Smith would incur certain expenses, while he invested it for them in the "CONUS" or "OCONUS." (See the Promissory Note attached as Exhibit A to the Amended Complaint).

Following the tendering of that payment, Defendant Smith – unbeknownst to the Sanfords -- actually deposited the money ($12.5 million) into SCG's corporate account with First Security Bank in Batesville, Mississippi, which had the **previous balance** of $9,757.55, or less than 0.1% of the amount deposited.

Once the Sanford checks had cleared, Defendant Smith transferred $10 million -- or 80%

---

[1] Notably, Defendant Smith attached a sworn affidavit to his first Motion to Dismiss, where he stated he had never spoken to and communicated with Mr. or Mrs. Sanford.

of the Sanfords' money -- to a separate trust account ("Trust Account"), which he had established for his "retirement" according to the representative for First Security Bank. See Deposition of Thad Campbell attached hereto as Exhibit A, page 12, ln 4-9, page 13, ln 14-20 and page 14, ln 2-5. ("His goal, of course, was retirement").[2]

### Dissipation of $2.5 Million in Business Account

The remaining $2.5 million was spent off in a year. For the most part, it was used to pay the costs on Defendant Smith's ongoing "business" which allegedly provided "security services" to VIP's and others. In actuality, SCG was a vehicle for Defendant Smith's bizarre military fantasies, i.e. building a "military compound" in rural Mississippi and traveling internationally in the guise of providing "security services." Of course, Defendant Smith also used SCG to pass the Sanford funds directly through to his family, e.g. the $8,000 cash transfer made to Smith's wife on November 30th, 2007. Deposition of Jamie Smith ("Smith Tr.") attached hereto as Exhibit B, at 87, ln 9-23.

As a practical matter, SCG had minimal incoming revenue according to bank records produced, while it spent lavishly on "business trips" to international locations.[3] In fact, the business was losing $300,000 per month, which meant that the $2.5 million was fully gone by early 2009. As the evidence at trial will show, the lost revenue from the business account was incurred largely in meaningless capital purchases (computers, vehicles, armored cars) or personal expenses. There was never any attempt made to hold the funds separate or attempt any return to the Sanfords. Eventually, the business was functionally shut down and the remaining monies transferred over to another "SCG, LLC," which Smith evidently created to transfer assets away

---

[2] It's undisputed that Smith was referring to his own retirement.
[3] The bank records attached to the Campbell deposition transcript amply spell out the personal nature of the "business" of SCG. Some of those "business" purchases include (i) updating a wedding ring for Smith's wife, (i) purchasing landscaping for his house and (iii) buying subscriptions to pornographic websites. See Smith Tr. at 113, ln 7-8, 115, ln 8-9, and 118, ln 16-17.

from SCG. See Smith Tr. at 102, ln 14-18 (referencing March 2010 transfer of $180,000 from corporate account of "SCG International LLC" to "SCG LLC").

### Disappearance of $10 million in Credit Account

The other $10 million disappeared. Indeed, Defendant Smith used the Trust Account to distribute proceeds to a bewildering array of LLC's and other privately-held companies or funds, including a $5 million transfer to "Credit Suisse" on April 23, 2008 – done at the instruction of Defendant Smith so as to "broaden his relationships" and restructure "his tax situation." (Campbell Tr. at 32, ln 1-17 and 48, ln 16-19). In moving the Sanford's money to new accounts, Smith told First Security of his "goal" that his "retirement funds" should be "invested overseas," which First Security was reluctant to do based upon their "fiduciary duty to the account." (Campbell Tr. at 51, ln 7-25) As the reality of collection became clearer in 2009, Defendant Smith became obsessive in transferring the funds to additional accounts from which the funds could not be traced.[4]

None of that money has been itemized by Defendant Smith or recovered by the Sanfords. It is plainly evident that Defendant Smith made these transfers in order to prevent any subsequent collection of the funds. Indeed, he and his associates bragged to the Sanfords about Defendant Smith's alleged reputation as a "wizard" with financial matters.[5] (See email attached as Exhibit C to the Amended Complaint).

The Trust Account itself was "liquidated" on January 6, 2010,[6] six months after the Sanfords had demanded the return of their funds and Smith's lawyer had falsely replied that their

---

[4] The Credit Suisse account was also emptied out, so that there is only $9,000 there as of February 2011. See Smith Tr. at 133, ln 9-13.
[5] As a related matter, the Sanfords note that the former "chief financial officer" of SCG – Troy Titus – is currently serving a twenty-three year sentence in Federal prison for defrauding investors.
[6] At that point, after twenty-six months of Defendant Smith's "management," the Trust Account had $53,000 left from the original TEN MILLION. (Campbell Tr. at 29, ln 20-22).

money had been "lost in the market." (See Campbell Tr. at 29, ln 6-8).

### Refusal to Account for Entrusted Funds

With their funds disbursed amongst a hundred different entities owned by Smith in some capacity, the Sanfords have spent the balance of this litigation trying to track down those assets, with zero success (except to learn a portion bought property now being used as security for $110,000.00 towards Defendant Smith's legal defense). See Supplemental Answers to Interrogatories attached hereto as Exhibit C at No. 4.

Indeed, the Asset List given by the Supplemental Answers – accepting all false statements as true – would account for only $2.2 million (or less than 20% of the original amount). Of course, that figure itself is fictitious as the list of "assets" – as will be documented at trial – is a false number which conspicuously fails to itemize the lost funds and places value on properties and equipment which have none (and for which there is no record of purchasing).

Presumably, without any credible explanation, all funds have been converted to the personal use of Defendant Smith, who initially told First Security Bank that the money was for "his retirement" and also used it to establish personal credit lines for himself and his wife, which they used for non-corporate purposes (Campbell Tr. at 18, ln 19-24) and then transferred the funds into various investment vehicles which could not be traced (See Supplemental Answers). The alternative explanation – that every single dollar was "lost in the market" – is patently false according to every financial record produced.

In short, Defendant Smith cajoled the Sanfords into placing $12.5 million into his custody so that he could successfully (i) capitalize his business and subsidize his personal lifestyle and (ii) distribute the money into LLC's and other closely-held companies, where the assets could not be traced, for his "retirement." Those plans to divert the money are

contemporaneous with his discussions with Mr. Sanford in November 2007. In short, every single fact in this case points to his having <u>personally</u> defrauded the Sanfords of $12.5 million, through the convenient vehicle of SCG.[7]

**OBJECTIONS TO THE DEFENDANTS' STATEMENT OF UNCONTESTED FACTS.**

4. The Sanfords dispute number 4 to the extent that the Promissory Note was for $12,500,000 plus .1% interest through May 27, 2009. *See* Exhibit C attached to the Memorandum in Support of their Motion for Summary Judgment.

5. The Sanfords dispute that the only purpose of the Promissory Note was to invest "in an ongoing commercial enterprise." *Id*.

9. The Sanfords dispute that it is undisputed that the Promissory Note is the only written agreement between the parties. Mr. Sanford only stated in deposition that he was not aware of any document regarding modification, amendment or waiver to the Promissory Note. *See* Deposition Transcript of Craig Sanford at 55:6-13 attached hereto as Exhibit D.

15. The Sanfords dispute they were "sheltering" their funds from any judgment entered in Pennsylvania in October of 2007. *See* Amended Complaint at ¶ 4. See Craig Sanford Dep. at 35:7-16.

16. The Sanfords dispute that SCG International, LLC was an ongoing commercial enterprise. *See* Craig Sanford Tr. at 66:13-21.

20. The Sanfords dispute money was lost merely because of an economic downturn. See Amended Complaint at ¶¶ 15-16 and First Security Bank Documents.

21. The Sanfords dispute $5,000,000 was transferred to Credit Suisse to recoup funds lost in the Trust Account. See Thad Campbell Tr. at 12:1-9; 14:5; 31:19-22; 32:7-13; 34:22-25.

---

[7] Not surprisingly, Defendant SCG – the obligor on the 2007 note to the Sanfords -- has no assets or revenue, as Defendant Smith has closed it down in favor of "another" SCG, SCG LLC, a Virginia limited liability company, which it he is currently operating for purposes of receiving revenue for his "business." Smith Tr. at 152, ln 13-17.

24.     The Sanfords dispute the economic downturn is the reason SCG International, LLC has been unable to meet its obligations under the Promissory Note.

28.     The Sanfords dispute that the Defendants ever intended to repay the amount owed under the Promissory Note.  Thad Campbell Tr. at 12:1-9; 14:5; 31:19-22; 34:22-25. See Amended Complaint at ¶¶ 23, 33-34.

29.     The Sanfords dispute loans to sister companies were made with the intent to repay the Promissory Note. Thad Campbell Tr. at 12:1-9; 14:5; 31:19-22; 34:22-25; See Amended Complaint at ¶¶ 23, 33-34.

30.     The Sanfords dispute that any sister companies of SCG International, LLC attempted to repay monies loaned to them.  See Jamie Smith Tr. at 102:5-13.

## II.     LEGAL STANDARD FOR SUMMARY JUDGMENT

The Court can only grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact," Fed. R. Civ. Proc. 56(c).

The party moving for summary judgment has the burden to show the evidence is insufficient to support the nonmoving party's case.  "The moving party must demonstrate the absence of an essential element of the nonmoving party's case and that it is entitled to judgment as a matter of law." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 185 (4th Cir. 2004). "Once the moving party discharges its burden by showing that there is an absence of evidence to support the nonmoving party's case, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." *Id*. We consider the facts in the light most favorable to the nonmoving party. *Id*.

### III. ARGUMENT

Notwithstanding the contested issues of fraud (which will be litigated at trial), there is no genuine dispute of material fact that SCG breached its agreement with the Sanfords to repay the $12.5 million, as promised in writing in 2007.

Under Virginia law the elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Filak v. George,* 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004)); *Ulloa v. QSP, Inc.,* 271 Va. 72, 79, 624 S.E.2d 43, 48 (2006).

On or about November 14, 2007 the Sanfords and SCG entered into a written agreement. See Amended Complaint at ¶8; See also Summary Judgment Mem. Exh. C. The Sanfords sent two checks totaling $12.5 million to SCG on November 21, 2007. Amended Complaint at ¶¶8-9. The "Promissory Note" stated the funds were to be returned to the Sanfords, with interest, on May 27, 2009. See Amended Complaint at ¶9; See also Summary Judgment Mem. Exh. C.

There is no dispute that SCG received the funds and deposited the money in one of its corporate bank accounts. Upon receiving the funds at his personal residence Defendant Smith deposited the funds in SCG's corporate bank account at First Security Bank in Batesville, Mississippi. Amended Complaint at ¶10. On or about November 30, 2007 the Defendants transferred $10 million to a trust account at First Security Bank, leaving $2.5 million in the corporate checking account. Amended Complaint at ¶15. The Defendants' Answer confirms this. See Answer to Amended Complaint at ¶15, attached to the Sanfords Memorandum in Support of their Motion for Summary Judgment as Exhibit D.

In their Answer to the Amended Complaint the Defendants admit that Defendant Smith

signed the "Promissory Note" on behalf of SCG and further admit that Defendant received the two checks for $12.5 million from the Sanfords on behalf of SCG. See Defendants' Answer to the Amended Complaint at ¶8. There is also no basis for the Defendants to deny the allegation in Paragraph 9 of the Complaint that the "Promissory Note" states $12.5 million plus interest is to be returned to the Sanfords on May 27, 2009. The Defendants further admit that the $12.5 million in funds were deposited at First Security Bank into one of SCG's corporate accounts. See Answer to Amended Complaint at ¶10.

The Sanfords have been harmed and suffered damages as a result of SCG's failure to abide by the terms of the contract. The Defendants have not made any repayment under the "Promissory Note". See Amended Complaint at ¶22. There is also no dispute that SCG was obligated by the terms of the contract to return $12.5 million plus interest to the Sanfords on May 27, 2009. See Answer to Amended Complaint at ¶22; See Exh. C. Therefore, there is no dispute that it is in breach.

The Sanfords have sufficiently alleged and proven in Count V of the Amended Complaint a breach of contract based on entering into the "Promissory Note" with SCG, SCG's acceptance of the funds from the Sanfords, and SCG's failure to repay the funds to the Sanfords, with interest, on May 27, 2009 or at any other point in time. See Amended Complaint at ¶¶51-53. SCG breached the November 14, 2007 contract entered into with the Sanfords.

**A. There is no summary judgment for unclean hands.**

The Defendants allege, yet have failed to prove, that the Sanfords entered into the transaction SCG for an "improper purpose".

The funds were delivered to SCG with the express promise that they would be held safe and then paid back. The Defendants' Memorandum fails to cite any legal authority, assuming

that the Sanfords entered into the transaction "to avoid a judgment", that such a contract is against public policy and unlawful as a result.

The doctrine of unclean hands is "not absolute and should not be applied when the result would be inequitable or against public policy." *Richards v. Musselman*, 221 Va. 181, 185 (1980). A court should deny relief under the doctrine of unclean hands only when there is a close nexus between a party's alleged unethical conduct and the circumstances upon which they seek relief. *See In re Uwimana.*, 274 F.3d 806, 810 (4th Cir. 2001). Here, the Defendants have failed to show any unethical or unlawful conduct on behalf of the Sanfords. Even if there were unethical or unlawful conduct, said conduct is not closely related to the allegations made by the Sanfords against the Defendants, namely that they fraudulently obtained funds from the Sanfords and have failed to pay those funds back.

Courts have found that allegations of self-dealing failed to warrant the application of the unclean hands doctrine when the self-dealing was not "connected with the transaction upon which the claimant sought relief". *Wetzler v. Cantor*, 202 B.R. 573 (D. Md. 1996). Even if the Sanfords were "self-dealing" as alleged by the Defendants it is not connected to the Defendants' fraudulent actions or their breach of the Promissory Note.

The Defendants have failed to prove the Sanfords engaged in any wrongful or unethical conduct. Nor have they shown any nexus. The Sanfords merely told SCG their reasons to have a safe place for the $12.5 million of family funds. The context of the transaction hardly opens the door to theft by the Defendants, who otherwise would profit from their dishonesty.

The Defendants spend time focusing on the fact that there was a default judgment entered against the Sanfords for just over $3 million in 2007. However, this judgment was later vacated as the parties reached a settlement agreement where the Sanfords could only possibly have been

liable for $125,000.  The Sanfords never had to pay $125,000.  See Craig Sanford Tr. at 39:5-8.  Additionally, the Sanfords were to be paid back pursuant to the terms of the Promissory Note thus they could not have been avoiding a judgment.

The doctrine of unclean hands does not apply to the facts of this case and the Motion for Summary Judgment on that basis should be denied.

**B. The Plaintiffs have a cause of action for fraud and satisfy the economic loss rule**

The Defendants assert that the only relationship between the parties is as the result of the "Promissory Note" the parties entered into on or about November 21, 2007.  In actuality, the principal gravamen of the plaintiffs' claim is that the entire transaction was a sham – that Smith had no intention of "keeping the funds" entrust to him or SCG, but always intended to convert the funds for his own purposes.  Therefore, the fraud claim stands on its own.

The Defendants allege that the Sanfords have failed to uncover sufficient evidence during the discovery process to substantiate their fraud claim.  On the contrary, the Sanfords have conclusively demonstrated to the Court that SCG and Defendant Smith never had any intent of investing the Sanfords' funds and, further, never had an intent to return the funds.  This is substantiated by Thad Campbell, the Trust Account Manager at First Security Bank in his deposition.  Mr. Campbell testified multiple times that Defendant Smith told him the funds were for *his* retirement and that Defendant Smith gave no other reason in later conversations other than the funds were for his retirement.  See Thad Campbell Tr. at 12:1-9; 14:5; 31:19-22; 34:22-25.  It is clear that numerous monies were not lost in the stock market and that Defendant Smith was operating a sham investment scheme because he intended to use the Sanfords' funds to finance his own personal financial purposes.

Additionally, the discovery process has produced voluminous bank records from First

Security Bank in Mississippi, Hampton Road Bank in Virginia, and other banks, as well as credit card statements that show Defendant Smith spent money for personal expenses. Defendant Smith admitted in his own deposition he used his credit card with First Security Bank for personal expenses. (See Jamie Smith Tr. at 112:20-113:1; 118:11-16 as a couple examples of personal expenses being paid by business credit cards).

Defendant Smith is simply not credible. He lied and made fraudulent statements to the Sanfords when he stated he graduated from Harvard Law School. See Craig Sanford Tr. at 42:20-43:3. Further there is evidence to support the allegation that Defendant Smith was not a director with Blackwater USA. *Id*. at 44:20-45:1. Additionally, there is evidence that SCG did not have $50 million in government contract. *Id*. at 45:6-16.

The Supreme Court of Virginia has recognized that a party can show both a breach of contract and a tortious breach of duty. *Foreign Mission Bd. v. Wade*, 242 Va. 234, 241 (1991). The Sanfords have shown both a breach of contract and a tortious breach of duty. The Sanfords have shown that SCG breached the contract with them by failing to repay $12.5 million dollars by May 27, 2009.

The Sanfords have shown, and sufficiently alleged, that SCG and Mr. Smith had no intention of disclosing what he was using the funds for, concealed what he was using the funds for and that SCG, nor Mr. Smith, ever had any intention of paying the Sanfords back. See Amended Complaint ¶¶ 22-23, 33-35; See Thad Campbell Tr. at 12:1-9; 14:5; 31:19-22; 34:22-25. Most importantly, the Sanfords have shown that the Defendants, at the time the contract was entered into by the parties, had no intention to adhere to the terms of the contract but rather Mr. Smith intended to personally benefit from the contract. See Amended Complaint ¶ 34; See Thad Campbell Tr. at 12:1-9; 14:5; 31:19-22; 34:22-25. These allegations are more than sufficient to

overcome the economic loss rule and proceed with a fraud claim. *See Foster v. Wintergreen Real Estate Co.*, 2010 Va. Cir. LEXIS 252 at *3-4 (Nov. 16, 2010).

Virginia's position on fraud claims arising out of contracts also supports the Sanfords' fraud count in this case. "A tort action exists against 'one who intentionally interferes with another's contractual rights.'" *Hilb, Rogal & Hamilton Co. v. DePew*, 440 S.E.2d 918, 921 (Va. 1994) quoting *Duggin v. Adams*, 360 S.E.2d 832, 835 (Va. 1987). The Defendants intentionally interfered with the Sanfords' contractual rights when they misrepresented how the funds would be invested, by concealing the true intent behind obtaining the funds and by concealing their intent not to pay the funds back to the Sanfords.

Under Virginia law, a concealment or omission of a material fact may also give rise to a claim of actual fraud. Although silence does not constitute fraud in the absence of a duty to disclose, *See Norris v. Mitchell*, 255 Va. 235, 495 S.E.2d 809, 812-13 (Va. 1998), "concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud," *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 597 (Va. 1984).

"A single act or occurrence can, in certain circumstances, support causes of action both for breach of contract and for breach of a duty arising in tort." *Augusta Mutual Insurance Co. v. Mason*, 274 Va. 199, 205 (2007), The Defendants knew that the Sanfords were acting upon the assumption their funds would be invested in an ongoing commercial enterprise, not used for Smith's own personal purposes. The Sanfords have shown Smith and SCG had the present intent at the time the Promissory Note was executed to save for Defendant Smith's retirement. See Thad Campbell Tr. at 12:1-9; 14:5; 31:19-22; 34:22-25. The Defendants' failure to do so

constitutes an actionable fraud claim separate from the contractual obligation between the parties.

In *Sea-Land Service, Inc. v. O'Neal*, 224 Va. 343 (1982) the plaintiff sued their employer for breach of contract and fraud, obtaining a judgment on both counts. The Virginia Supreme Court held that promises which are made with a present intention not to perform qualify as fraud. *Id*. The plaintiff in *Sea-Land* recovered contract and tort damages. As alleged in the Amended Complaint and proven in discovery, the Defendants had a present intention when they entered into the contract with the Sanfords not to perform the terms of the contract. The Defendants' actions constitute fraud.

Finally, as alleged in Count III of the Amended Complaint, SCG and Mr. Smith entered into a fiduciary relationship when agreeing to invest the Sanfords' funds. "A fiduciary relationship exists in all cases when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *H-B Ltd. P'ship v. Wimmer*, 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979). Defendant Smith and SCG were bound by the contract to act in the best interests of the Sanfords. They failed to do so.

"[I]ncorporated in every contract between a fiduciary and his principal is an obligation, imposed by law upon the fiduciary, to disclose anything known to him which might affect the principal's decision whether or how to act." *Owen v. Shelton*, 221 Va. 1051, 1054, 277 S.E.2d 189, 191 (1981). This common law duty was violated by SCG and Defendant Smith. As alleged in the Amended Complaint and proven in discovery, the Defendants never intended to invest the Sanfords' money as stated in the contract. Thus, the Defendants had a duty to disclose at the

14

time they entered into the contract they would not invest the money as stated in the contract. The Defendants' failure to do so is a breach of their fiduciary duty to the Sanfords.

As a result, the Sanfords are entitled to assert tort claims against them and have done so in accordance with the economic loss rule. The Motion for Summary Judgment should be denied on these grounds as well.

### C. The Plaintiffs can hold Smith personally liable.

The Defendants are incorrect in asserting that the Plaintiffs cannot hold Mr. Smith personally liable, as he is protected by SCG's corporate veil. Mr. Smith is personally liable based on using the Sanfords' funds based upon his personal role in defrauding the Sanfords and also using the money for his own purposes. These actions are not protected by SCG's corporate veil. "Generally, if shareholders treat assets of the corporation as their own, use corporate funds to pay private debts… or generally disregard corporate formalities, courts will often find that the corporate entity is a mere agent of the stockholder." *Kirkpatrick v. First American Title Ins. Co.*, 16 Va. Cir. 534, 540 (Feb. 25, 1985). Discovery has produced substantial evidence, in the form of bank records and Defendant Smith's deposition testimony, that he used the funds for personal purposes and intended to use the funds for personal purposes. Defendant Smith told Mr. Campbell his sole intention for the entire $12.5 million was to save for his retirement. See Thad Campbell Tr. at 12:1-9; 14:5; 31:19-22; 34:22-25. Defendant Smith's wife was a signatory on the business credit card and she was not an employee of SCG. See Thad Campbell Dep. at. 19:15-24. This makes the expenditure of all funds personal expenditures showing a breach of fiduciary duty.

The Defendants argue that absent extraordinary circumstances, a borrower does not have a fiduciary duty to a lender. *See Rossmann v. Lazarus,* No. 1:08cv316, 2009 WL 87583, *9

15

(E.D. Va. Jan. 9, 2009) (citing *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 678-79 (S.D. N.Y. 1991), *aff'd*, 962 F.2d 1 (2d. Cir. 1992)).

In determining whether these rare circumstances exist, other courts have looked to whether the lender exercised "substantial control over the debtor's business affairs." *Blue Line Coal Co. v. Equibank*, 683 F. Supp. 493, 496 (E.D. Pa. 1988) (*citing NCNB Nat'l Bank of N.C. v. Tiller*, 814 F.2d 931, 936 (4th Cir. 1987)). There is no dispute that the Defendant Smith had substantial control over the funds obtained from the Sanfords. He was in total control in deciding how they were invested, how and when they were spent, he claims to have had no duty to communicate with the Sanfords and he alone made decisions regarding the funds. When a lender commits fraud and ignores the rights of the plaintiffs that is sufficient to establish a fiduciary relationship and prove a breach. *Al-Ghanem v. DeVol*, 1998 Va. Cir. LEXIS 554, *6.

Defendant Smith's dominant control over the Sanfords' funds creates the extraordinary circumstances needed to show a breach of a fiduciary duty. Defendant Smith's wrongful and fraudulent actions in his personal capacity make him liable and a proper Defendant. The Motion for Summary Judgment should also be denied on this basis.

## IV. CONCLUSION

SCG breached its contract with the Sanfords by failing to return their investment of $12.5 million on May 27, 2009. SCG has not returned any amount of money to the Sanfords at any point in time. SCG's failure to return the funds to the Sanfords is a breach of the terms of the November 14, 2007 "Promissory Note".

The Sanfords did not enter the contract with SCG with unclean hands. The Sanfords reached a settlement agreement regarding the Pennsylvania judgment. Regardless, the funds invested with SCG were to be returned to the Sanfords. The economic loss rule does not prevent

recovery in this matter because the Sanfords have shown a fraud claim separate from the contract as required by Virginia and Pennsylvania law.  Finally, Defendant Smith is personally liable because he breached his fiduciary duties to the Sanfords.  The Sanfords respectfully request that the Court deny the Defendants' Motion for Summary Judgment as too all counts of the Amended Complaint.

                                                    CRAIG SANFORD
                                                    MARY JO SANFORD
                                                    By Counsel

_____/s/_____
J. Chapman Petersen, Esq., VSB #37225
Jason F. Zellman, Esq., VSB # 77499
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone 703.251.5400
Facsimile 703.591.9285
jpetersen@siplfirm.com
jzellman@siplfirm.com

<u>Certificate of Service</u>

  I hereby certify that on this 20th day of May, 2011 I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following individuals.  Additionally, I transmitted the foregoing by facsimile to the following individuals:

Brent L. VanNorman, Esq.
Hunton & Williams LLP
500 East Main Street, Suite 1000
Norfolk, VA  23510
bvannorman@hunton.com
Counsel for Mr. Smith and SCG International, LLC


_____/s/_____
J. Chapman Petersen, Esq., VSB #37225
Jason Zellman, Esq., VSB #77499
Counsel for the Sanfords
Surovell Isaacs Petersen & Levy PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
Telephone: 703-251-5400
Facsimile: 703-591-9285
jpetersen@siplfirm.com
jzellman@siplfirm.com
